**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DENISE BARKER, | )    CASE NO. 1:14-CV-01184 |
|            Plaintiff, | ) |
| | ) |
|          v. | )    MAGISTRATE JUDGE |
| | )    VECCHIARELLI |
| CAROLYN W. COLVIN, | ) |
|       Acting Commissioner of Social | ) |
|       Security, | )    **MEMORANDUM OPINION AND** |
| | )    **ORDER** |
|            Defendant. | ) |

Plaintiff, Denise Barker ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423.  This case is

before the undersigned United States Magistrate Judge pursuant to the consent of the

parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth

below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On October 8, 2010, Plaintiff filed her application for POD and DIB, alleging a

disability onset date of July 3, 2009.  (Transcript ("Tr.") 136.)  The claim was denied initially

and upon reconsideration, and Plaintiff requested a hearing before an administrative law

judge ("ALJ").  (*Id.*)  On November 14, 2012, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff

participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational

expert ("VE") also participated and testified.  (*Id.*)  On January 7, 2013, the ALJ found

Plaintiff not disabled.  (Tr. 1.)  On April 17, 2014, the Appeals Council declined to review

the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On June 3, 2014, Plaintiff filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 14, 16.)

Plaintiff asserts the following assignments of error: (1) The ALJ failed to adequately consider Plaintiff's left upper extremity limitations in assessing her residual functional capacity; and (2) new evidence warrants remand.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in April 1966 and was 43-years-old on the alleged disability onset date. (Tr. 151.) She had at least a high school education and was able to communicate in English. (*Id.*) She had past relevant work as a collections clerk, telemarketer, and customer service representative. (Tr. 150.)

### B.  Medical Evidence[1]

In 2006, Plaintiff was involved in a motor vehicle accident which caused injury to her right hand and wrist. (Tr. 737.) She underwent right thumb and wrist surgery in 2007,

---

[1]     The ALJ found that Plaintiff had the following severe impairments: obesity, status post: right thumb ulnar collateral ligament reconstruction, right hand de Quervain's release, right hand open carpal tunnel release, and right hand Feldman distal ulnar resection; right hand CMC joint arthritis; left hand thumb synovitis; degenerative disc disease in the cervical spine; degenerative changes of the lumbar spine; and major depressive disorder. (Tr. 138.) Plaintiff's challenge to the ALJ's decision concerns the ALJ's assessment of the physical impairments affecting Plaintiff's left upper extremity. Accordingly, the Court will limit its summary of Plaintiff's medical records to evidence most relevant to that issue.

2

including a carpal tunnel release and a Feldman distal ulnar resection.  (Tr. 456, 528, 669, 739-741.)  In January 2008, Plaintiff's orthopedist, William Seitz, Jr., M.D., noted arthritic changes in Plaintiff's right thumb as well as some evidence of compression of the median and ulnar at the right wrist.  (Tr. 746.)

On October 10, 2008, Plaintiff saw Josephine Fernando, M.D., for an initial visit for right hand numbness and stiffness that had lasted for over 18 months.  (Tr. 486.)  Examination revealed sensory loss over the palm of the right hand, atrophy, tenderness in the right thumb, and moderate limitation of motion of the wrist and fingers.  (Tr. 487.)

On October 29, 2008, Plaintiff reported to orthopedist Steven Maschke, M.D., that surgery had significantly reduced her pain, but that there was still numbness and tingling in her right pinky and ring finger and some pain centered over the middle knuckle of her right thumb.  (Tr. 456.)

Plaintiff returned to Dr. Maschke in March 2009 with complaints of some intermittent pain in her right hand and wrist and some numbness and tingling in the ulnar nerve distribution.  (Tr. 669.)  She also complained of pain in her left thumb's carpometacarpal (CMC) joint (the joint at the base of the thumb) and difficulty with opening jars, turning door handles, and pinching.  (Tr. 669.)  Dr. Maschke noted some tenderness directly over the first CMC joint with a positive CMC grind in Plaintiff's left hand.  (*Id.*)  On examination, Plaintiff could make a full composite fist and fully extend all of her digits.  (*Id.*)  Floroscopic images of the left thumb did not demonstrate any significant arthritis or any other bony abnormality.  (*Id.*)  Dr. Maschke further noted Plaintiff's hypersensitivity of the dorsum of her right thumb and pain with palpation throughout the entire wrist to even light touch.  (*Id.*)  He diagnosed Plaintiff with left thumb CMC synovitis and right hand pain

3

status post complex hand and wrist reconstruction.  (*Id.*)  He administered a cortisone injection to her left hand and recommended electromyography (EMG) nerve conduction studies for Plaintiff's right arm.  (*Id.*)

Plaintiff was involved in a second car accident in April 2009 and complained of shoulder, chest, and low back pain following the accident.  (Tr. 570.)  On April 20, 2009, Plaintiff was wearing a brace on her right wrist, but her motor and sensory examination was intact in her upper extremities.  (Tr. 571.)  A computerized tomography (CT) scan of her cervical spine showed small anterior osteophytes at C3-C4 and C6-C7, but the intervertebral disc spaces were maintained.  (Tr. 587.)  After her discharge from the hospital, Plaintiff received chiropractic treatments for her pain through June 2009.  (Tr. 539-599.)

In September 2009, Plaintiff complained to Dr. Seitz that she continued to have right ulnar neuropathy and de Quervain's involving the left wrist and left trigger thumb.  (Tr. 747.)  In February 2010, Plaintiff returned to Dr. Seitz with complaints of continued pain in her neck and shoulders with radiating pain down into her arms, which worsened when she sat at her workstation.  (Tr. 748.)  Dr. Seitz observed evidence of both ulnar neuropathy and cervical radiculopathy.  (*Id.*)  On examination, Dr. Seitz indicated that there was tenderness with radiation down into the ulnar nerve distribution with movement of Plaintiff's neck and that she was limited in her cervical mobility.  (*Id.*)  There was tenderness overlying the ulnar nerve at the elbow with a markedly positive Tinel's and Phalen's.  (*Id.*)  Dr. Seitz noted that Plaintiff's EMG testing was normal, so he recommended an MRI of Plaintiff's cervical spine.  (*Id.*)  An MRI from March 2010 showed overall mild degenerative changes in the cervical spine with "the most significant finding" being mild canal stenosis

4

at C4-C5 due to central disc protrusion, which impinged on the ventral surface of the cervical cord.  (Tr. 652-653.)  Dr. Seitz also observed a disc protrusion at T2-T3 that appeared to impinge on the spinal cord.  (Tr. 653.)  At a follow-up appointment in April 2010, Dr. Seitz reported that the MRI showed some signs of a herniated nucleas polpsus and that Plaintiff had ulnar nerve compression neuropathy at the right elbow.  (Tr. 749.)  She underwent nerve decompression surgery on her right elbow in April 2010.  (Tr. 750.)

On July 8, 2010, Dr. Seitz reported that Plaintiff healed well after surgery, but continued to have severe neck pain radiating down her shoulder.  (Tr. 754.)  Dr. Seitz recommended continued use of anti-inflammatory medication, warm soaks, and a range of motion exercises for relief.  (*Id.*)  He reported that Plaintiff's distal neuropathic symptoms were much improved.  (*Id.*)

Plaintiff presented to Brian Derhake, M.D., for pain management in September 2010.  (Tr. 651.)  Plaintiff complained of pain in the posterior portion of her neck and at the base of the skull that radiated into her shoulders.  (*Id.*)  She also complained of numbness and tingling in her arms, hands, and fingers in the distribution of the ulnar.  (*Id*)  On examination, the Spurling's test (a test for cervical radiculopathy) was negative bilaterally.  (Tr. 654.)  Plaintiff had some pain with range of motion of the neck and tender cervical spine muscles throughout the neck, shoulders, and upper back.  (*Id.*)  Plaintiff's upper extremity strength was normal with no loss of sensation noted.  (*Id.*)  On October 13, 2010, Plaintiff received a left C4, C5, C6 cervical facet medial branch nerve block.  (Tr. 647.)  She attended physical therapy for cervical spondylosis from October 2010 through December 2010.  (Tr. 672-697.)

In November 2010, Dr. Seitz noted that the nerve block provided some relief,

although Plaintiff continued to complain of some pain in her right hand and numbness in her hand and wrist.  (Tr. 755.)  Dr. Seitz recommended use of anti-inflammatory medication, warm soaks, and range of motion exercises for relief.  (*Id.*)

In January 2011, Plaintiff reported to Cleveland Clinic Pain Management physician Matthew Hansen, M.D., that her pain had been stable and that 75 percent of her pain was located in her back and the remaining 25 percent was located in her neck.  (Tr. 716.)  Dr. Hansen noted that Plaintiff did not appear to be in distress and there was no pain with range of motion of her neck or to palpation of the cervical paraspinous muscles.  (Tr. 717.)  A physical examination showed normal muscle strength in her upper extremities, no atrophy, and no loss of sensation.  (*Id.*)

Plaintiff returned to Dr. Seitz in March 2011 and he noted that the area of the right thumb reconstruction was stable and Plaintiff was moving her thumb quite well.  (Tr. 756.)  Dr. Seitz noted that the area of the distal radio-ulna joint reconstruction was moving well despite some tenderness in that area.  (*Id.*)  Plaintiff's major complaint was bilateral shoulder pain.  (*Id.*)  Dr. Seitz noted that Plaintiff had a painful arc of motion, positive impingement signs, and tenderness at the acromioclavicular (AC) joint with direct compression as well as cross adduction.  (Tr. 757.)  X-rays showed type III acromion with prominent anterior acrominal edge, arthritic changes of the AC joint bilaterally with superior offset suggesting a chronic AC sublaxation as well as arthrosis.  (*Id.*)  The right shoulder showed some heterotopic bone around the acromion with suggestion of an un-united acromial apophysis with arthrosis.  (Tr. 756.)  Dr. Seitz recommended an ultrasound of the shoulder but noted that it did not reveal a full-thickness tear, but only some partial thickness erosion.  (Tr. 758.)  He diagnosed Plaintiff with impingement, AC arthritis,

6

adhesive capsulitis, and synovitis.  (Tr. 758.)  He injected Plaintiff's subacromial space, AC joint, and glenohumeral joint with a pain reliever.  (*Id.*)

In August 2011, Dr. Seitz noted that Plaintiff had negative Tinel's and Phalen's signs, but she had paresthesias especially in the ulnar nerve distribution, which appeared to be caused by cervical radiculopathy.  (Tr. 797.)  Plaintiff also had signs of shoulder impingement.  (*Id.*)  Dr. Seitz believed that cervical radiculopathy was the primary source of Plaintiff's pain.  (*Id.*)  Additionally, Plaintiff reported that the nerve blocks in her spine were becoming less effective, so Dr. Seitz recommended a consultation with a spinal surgeon.  (*Id.*)

On August 22, 2011, Plaintiff saw spinal surgeon Robert McClain, M.D., and spine fellow surgeon Suzanne Tharin, M.D., Ph.D.  (Tr. 810-813.)  Dr. McClain concluded that there was no role for surgical treatment of Plaintiff's neck, as her shoulder pain was focal to the shoulder itself and radiating pain was not truly radicular in distribution.  (Tr. 810.)  He noted that there were incongruencies on examination.  (*Id.*)  On examination, Dr. Tharin noted that Plaintiff's extremities were normal, she had a normal spine range of motion, and her muscular strength was intact.  (Tr. 811-812.)  She further noted that Plaintiff had decreased sensation to light touch in her right thumb, first two fingers, and entire right palm.  (Tr. 811.)  Dr. Tharin noted some inconsistencies in the provocation of numbness and Plaintiff's endorsed numbness provided by neck pinching and finger straightening.  (Tr. 812.)  Plaintiff's cervical MRI showed mild degenerative disease and no evidence of disc herniation or nerve root impingement.  (*Id.*)  Dr. Tharin recommended that Plaintiff continue pain management, resume physical therapy, and seek further consultation with Eric Mayer, M.D.  (Tr. 812.)

Dr. Mayer evaluated Plaintiff in early September 2011.  (Tr. 869-873.)  On examination, he found no fibromyalgia tender points, normal cervical range of motion without pain, and negative Spurling's test.  (Tr. 871.)  Examination of her shoulder showed positive shoulder impingement signs on the right, negative shoulder impingement signs on the left, and decreased range of motion in the right shoulder.  (Tr. 872.)  Dr. Mayer noted that Plaintiff wore a right wrist brace, but found no atrophy or loss of strength in her wrists.  (*Id.*)  She had normal sensation and reflexes in her upper extremities and full motor strength in her upper extremities, with the exception of her right deltoid.  (Tr. 872.)  Dr. Mayer provided no surgical recommendations, but referred Plaintiff to occupational therapy for cervical pain.  (Tr. 873.)

On October 17, 2011, Daniel J. Leizman, M.D., completed a medical source statement regarding Plaintiff's physical capacity.  (Tr. 926-927.)  Dr. Leizman reported that Plaintiff suffers from right shoulder impingement, right wrist carpal tunnel syndrome, left hip pain, and left knee pain.  (Tr. 926.)  He opined that Plaintiff could lift and carry a maximum of 20 pounds occasionally; stand and walk 15 minutes at a time for up to four hours in an eight-hour work day; sit for 30 minutes at a time for up to eight hours in an eight-hour work day; occasionally reach and handle; rarely push and pull; frequently feel, and perform fine and gross manipulation; and she requires a sit/stand option.  (Tr. 926-927.)  He concluded that Plaintiff was limited to "light duty type work" with limited use of her right wrist and right shoulder and right shoulder activity above shoulder level.  (*Id.*0

In October 2011, an MRI of Plaintiff's right shoulder revealed minimal edema with possible mild bursitis and mild osteoarthritis of the AC joint, which did not represent any "significant signs of abnormalities."  (Tr. 961-962, 982-983.)  In April 2012, Plaintiff

8

complained of worsening pain in her right shoulder as well as global pain involving her right arm.  (Tr. 1049.)  A May 2012 MRI of her right shoulder showed a more pronounced hypertrophic nonunion of the os acromiale.  (Tr. 1021, 1084.)  Plaintiff proceeded with right shoulder surgery performed by Dr. Seitz in May 2012.  (Tr. 1013-1014.)  Treatment notes indicate that Plaintiff was doing well post-surgery with slightly reduced strength on her right side.  (Tr. 1030.)

## C.    Hearing Testimony

### 1.    Plaintiff's Hearing Testimony

Plaintiff was involved in a car accident in 2006.  (Tr. 165.)  As a result, she required carpal tunnel surgery, removal of a bone from her right wrist, and reconstruction of her thumb.  (*Id.*)  She testified that she was removed from her job at Medical Mutual in January 2008 because she was in a lot of pain and could not grasp or hold anything with her right hand.  (Tr. 165-166.)  Plaintiff was involved in a second car accident in 2009 and testified that she began experiencing neck and shoulder pain as a result of that accident.  (Tr. 167.)

Plaintiff testified that her most problematic areas were her shoulders, elbow, and wrist.  (Tr. 168.)  She stated that her left shoulder was not as problematic as her right shoulder.  (*Id.*)  She described her difficulties with her left shoulder as "some motor loss, loss of motor skills in the left side and some numbness in the hands, some tingling in the fingers.  Also some swelling of the elbow right now."  (*Id.*)  Plaintiff stated that her doctor suggested that the numbness and tingling in her left hand was caused by strenuous activities that Plaintiff attempted to perform with only her left arm.  (Tr. 170.)

Plaintiff testified that she could lift 20 pounds with her left arm, but no more than five pounds with her right.  (Tr. 172.)  She could stand for about one hour, walk for about 30

minutes, and sit for about 30 minutes at a time.  (*Id.*)  Plaintiff stated that she experienced constant pain that she rated as a nine out of 10 in severity.  (*Id.*)

Plaintiff described her typical day as getting up early to see her son off to school and then sitting or lying around and watching the news and a few talk shows until she eventually fell asleep.  (Tr. 171.)  She stated that she needed help dressing; she could shower by herself; she could do light cooking with her sons' help lifting heavy pots; and her sons handled the housekeeping chores.  (Tr. 170.)

### 2.    Vocational Expert's Hearing Testimony

Gail Franklin, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 179.)  The individual would be limited to light work with some limitations.  (*Id.*)  The individual would be limited to frequent pushing and pulling with the left upper extremity and no pushing or pulling with the right upper extremity.  (Tr. 179-180.)  The individual would require a sit/stand option, defined as allowing the individual to sit or stand alternatively at will provided that the individual is not off task more than 5 percent of the work period.  (Tr. 179.)  The individual would be limited to frequent climbing of ramps and stairs but could never climb ladders, ropes, or scaffolds.  (*Id.*)  The individual would be limited to occasional balancing, stooping, kneeling, and crouching but could never crawl.  (*Id.*)  The individual would be limited to frequent bilateral overhead reaching and frequent fingering and feeling with the right hand but only occasional handling with the right hand.  (Tr. 179-180.)  The individual must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights and would be limited to simple, routine, and repetitive tasks.  (Tr. 179.)  Furthermore, the individual would be limited to superficial

10

interaction with the public and coworkers.  (*Id.*)  The VE testified that the hypothetical individual would be capable of performing such jobs as a bakery helper, a group sales representative, and a surveillance system monitor.  (Tr. 181.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not

11

prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.

2.  The claimant has not engaged in substantial gainful activity since July 3, 2009, the alleged onset date.

3.  The claimant has the following severe impairments: obesity, status post: right thumb ulnar collateral ligament reconstruction, right hand de Quervain's release, right hand open carpal tunnel release, and right hand Feldman distal ulnar resection; right hand CMC joint arthritis; left hand thumb synovitis; degenerative disc disease in the cervical spine; degenerative changes of the lumbar spine; and major depressive disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to frequent pushing and pulling with the left upper extremity but may never push or pull with the right upper extremity.  The claimant must have a sit/stand option defined as allowing the individual to sit or stand alternatively at will provided that the individual is not off task more than 5 percent of the work period.  The claimant is limited to frequent climbing of ramps and stairs but may never climb ladders, ropes, or scaffolds.  The claimant is limited to occasional balancing, stooping, kneeling, and crouching but may never crawl.  The claimant is limited to frequent bilateral overhead reaching.  The claimant is limited to frequent fingering and feeling with her right hand but only occasional handling with her right hand.  The

claimant must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights. She is limited to simple, routine, and repetitive tasks. The claimant is limited to superficial interaction with the public and coworkers.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born in April 1966, and was 43-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 3, 2009, through the date of this decision.

(Tr.138-152.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review

13

the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignments of Error

#### 1.    The ALJ Failed to Adequately Consider Plaintiff's Left Upper Extremity Limitations in Assessing Her Residual Functional Capacity.

Plaintiff argues that the ALJ erred in determining Plaintiff's residual functional capacity (RFC), because the ALJ did not fully address the medical evidence regarding Plaintiff's left upper extremity impairments or impose any significant functional limitations regarding Plaintiff's left upper extremity.  Specifically, Plaintiff maintains that the ALJ failed "to rationally connect the evidence regarding [Plaintiff's] left thumb CMC synovitis, de Quervain's syndrome involving the left wrist and trigger thumb, and cervical neuropathy" in determining Plaintiff's limitations in using her left upper extremity.  (Plaintiff's Brief ("Pl.'s Br.") at 17.)  Plaintiff argues that because there is evidence in the record concerning pain, numbness, tingling, and weakness of her left shoulder, arm, and hand, the ALJ should have assessed additional limitations on Plaintiff's use of her left upper extremity.  (*Id.*)  For

14

the following reasons, Plaintiff's argument is without merit.

In his RFC determination, the ALJ limited Plaintiff to frequent pushing and pulling with the left upper extremity. (Tr. 18.) Plaintiff argues that the evidence record demonstrates that her left upper extremity pain, numbness, tingling, and weakness required greater restrictions than those assigned by the ALJ.[2] She points to no medical evidence, however, establishing that her left upper extremity issues interfered with her ability to perform basic work activities beyond the extent determined by the ALJ. Although the record contains evidence that Plaintiff complained of pain and had diagnoses of left thumb CMC synovitis, de Quervain's syndrome involving the left wrist and trigger thumb, and cervical neuropathy, this evidence says nothing about the severity of Plaintiff's impairment. *See, e.g., Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) ("The mere fact that plaintiff suffered from a dysthymic disorder . . . does not automatically entitle plaintiff to the receipt of benefits. Rather, in order to qualify for the receipt of benefits . . . plaintiff must show that she was disabled by her dysthymic disorder."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."). Furthermore, Plaintiff has not addressed any records from a physician indicating not only that Plaintiff has diagnosed impairments and pain associated with her left upper extremity, but also that she has associated functional limitations that could render her disabled.

Additionally, the ALJ did not, as Plaintiff contends, ignore pertinent evidence

---

[2]    While Plaintiff argues that the record evidence supports greater limitations than those assessed by the ALJ, she does not indicate what those limitations might be.

regarding Plaintiff's left upper extremity in determining her RFC.  As the Commissioner notes in her Brief, the ALJ discussed all of the evidence Plaintiff cites in her Brief with the exception of a September 2009 visit with Dr. Seitz, which was a two-sentence report noting that Plaintiff had symptoms of right ulnar neuropathy and de Quervain's involving the left wrist and trigger thumb involving the left thumb.  (Pl.'s Br. at 16; Tr. 747.)  Although an ALJ is required to *consider* all of the evidence in the record, he is not required to *discuss* each item of evidence in his opinion.  *See, e.g., Thacker v. Comm'r of Soc. Sec., 99 F. App'x 661, 665 (6th Cir. 2004)* ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.")  Here, it is clear that even though the ALJ did not discuss one of Dr. Seitz's treatment notes, the ALJ adequately considered Plaintiff's treatment with Dr. Seitz, as the ALJ's decision discusses Dr. Seitz's treatment records in detail.  (Tr. 143-146.)  As Plaintiff has provided no evidence from a physician suggesting that she required additional limitations beyond those provided for in the ALJ's RFC, and the ALJ adequately considered the evidence of record, Plaintiff's first assignment of error is without merit.

## 2.    New Evidence Warrants Remand.

After her administrative hearing, Plaintiff presented evidence to the Appeals Council that had not been considered by the ALJ.  This evidence consisted of records from the Cleveland Clinic, Dr. Seitz, and Lutheran Hospital setting forth continuing surgeries to correct Plaintiff's right upper extremity and a diagnosis of fibromyalgia.  The Appeals Council considered this evidence, but found that the records were from a time period following the ALJ's January 7, 2013, decision and therefore did not affect the ALJ's decision.  (Tr. 1-6.)  Plaintiff argues that the Court should remand her case for further

16

consideration of the records, because the records are new and material to a determination of disability.

Under 42 U.S.C. § 405(g), a court "may . . . remand [a] case to the Commissioner . . . for further action by the Commissioner . . . and it may at any time order additional evidence to be taken before the Commissioner . . . , but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  The party seeking remand under § 405(g) bears the burden of showing that remand is appropriate.  *See, e.g., Sizemore v. Sec. of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).  Evidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (internal quotation marks omitted).  Evidence is material only if it concerns the plaintiff's condition during the relevant period of time (typically, the period through the date of the ALJ's hearing decision).  *See Oliver v. Sec. of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).  "In order for the claimant to satisfy this burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.

Here, there is little question that the medical records at issue are "new," as the records concern a time period following the ALJ's hearing decision.  Thus, the remaining question is whether the records are "material."  Plaintiff argues, in part, that the records are material because they include a diagnosis of fibromyalgia.  Plaintiff maintains that "if the ALJ knew of Plaintiff's . . . diagnosis of fibromyalgia, the ALJ would have had to more

17

closely evaluate listing 1.02 and 1.07, use different standards in the evaluation of [Plaintiff's] pain and limitations, and it is likely he would have reached a different decision." (Pl.'s Br. 19-20.)  This argument is not well taken.  First, as explained previously in this Court's discussion of Plaintiff's first assignment of error, the mere diagnosis of a condition, like fibromyalgia, says nothing about the severity of the condition.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  Furthermore, Plaintiff has presented no evidence demonstrating that she suffered from fibromyalgia during the period of time considered by the ALJ.  Thus, the evidence Plaintiff presented to the Appeals Council is not time relevant, and therefore not material.

Plaintiff also suggests that the later-submitted evidence, which includes records of an additional right shoulder surgery, is material because the evidence "proves continuing deterioration of [Plaintiff's] right upper extremity."  (Pl.'s Br. 19.)  As the Sixth Circuit has observed, however, "[r]eviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition."  *Sizemore*, 865 F.2d at 712 ("Evidence which reflected the applicant's aggravated or deteriorated condition is not relevant because such evidence does not demonstrate the point in time that the disability itself began.")  If Plaintiff's condition has seriously deteriorated since the ALJ rendered his decision, the appropriate action for Plaintiff to pursue would be to initiate a new claim for benefits as of the date her condition aggravated to the point of constituting a disabling impairment.  *Id.* (citations omitted).  Moreover, as the Commissioner notes in her Brief, the ALJ recognized that Plaintiff underwent five surgeries from 2006 through the January 7, 2013, decision:  two carpal tunnel releases (the most recent in 2009); wrist/hand surgery in 2006; an ulnar decompression in April 2010; and right shoulder

18

surgery in May 2012.  (Tr. 143-150, 810.)  This undermines Plaintiff's argument that there is a reasonable probability that evidence of a sixth surgery would alter the ALJ's decision. For the foregoing reasons, Plaintiff is not entitled to remand.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: June 11, 2015

19